## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.B. (a minor child),<br>TAMIKA McCRAY,<br>JAMES TUCKER,<br><br>903 Varnum Street NW<br>Washington, D.C. 20011,<br><br>     Plaintiffs,<br><br>     v.<br><br>THE DISTRICT OF COLUMBIA,<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004,<br><br>Officer John Wright<br>Metropolitan Police Department<br>(Badge No. 2907),<br><br>John Doe Officers 1–20,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>   Case No. 1:15-cv-1490<br>)<br>)<br>)<br>   Jury Trial Demanded<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

1.    On February 21, 2013, shortly after 8:00pm, six-year-old A.B. sat at his mother's kitchen table.  His great uncle, James Tucker, sat quietly on the couch, recovering from the flu. A.B.'s mom, Tamika McCray was resting in her bedroom upstairs.  Suddenly, the family heard loud knocks on the front door.  Before Tucker had time to get up, officers from the Metropolitan Police Department ("MPD") broke down the back door and invaded the home, screaming and pointing their guns at Tucker's head as they forced him into handcuffs with no explanation. McCray, rushed downstairs, only to witness a large MPD officer searching inside her six-year-old son's tight white underwear as he stood frightened and alone in the kitchen.  Armed MPD officers ransacked the home that night, brandishing weapons and violently tearing apart the

1

family's intimate belongings.   McCray, who suffers from high blood pressure, was so traumatized by the violent invasion of her home and the physical violation of her young son's private areas that she suffered a severe panic attack and had to be rushed to the hospital by ambulance.

2.      Neither Tucker, McCray, nor A.B. was suspected of any wrongdoing.   MPD officers had no facts or evidence that any illegal activity had occurred in the family home at any time.

3.      Still, at least 15 MPD officers forcibly entered the McCray home and searched through the family's belongings in pursuit of drugs and records related to sophisticated narcotics and gun trafficking operations.   They did so based on a fraudulently obtained warrant written after a traffic stop that occurred 10 days prior to the home invasion — a stop that did not involve the McCray home nor any of its regular occupants.

4.      The search warrant application lacks even a *single* particularized fact suggesting that drugs, records, guns, or other contraband would be present in the McCray home.   Instead, the search warrant application relies on two things: (1) 10 days earlier, a handgun and unspecified amount of cocaine were found in the car of McCray's husband, Russell Battle, and (2) officer John Wright's generic and conclusory claims that, based on his "training" and "experience," it is common for individuals who deal in narcotics to maintain books, records, receipts, bank records, and other contraband in "locations where they will have ready access to them," such as their residences.

5.      Nothing illegal was ever found in the home.

6.      During the course of the unlawful home invasion, officers humiliated, traumatized, verbally taunted, and physically abused vulnerable people completely innocent of

any wrongdoing.  It took numerous days for the family to undo the destruction and mess that MPD officers inflicted on their home.

7.      What happened to A.B. and his family raises grave concerns regarding the systemic misconduct and recklessness of the MPD in obtaining and executing search warrants in the District of Columbia.[1]

## Nature of the Action

8.      The plaintiffs seek punitive damages and compensatory relief for the violations of their constitutional rights that occurred as a result of the MPD's violent home invasion.

## Jurisdiction and Venue

9.      This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

11.     Plaintiff Tamika McCray is a 34-year-old mother of two living in the District of Columbia.  Plaintiff James Tucker is the 54-year-old uncle of McCray.  Plaintiff A.B. is the eight-year-old son of Ms. McCray; at the time of the MPD raid of his home, A.B. was six years old.

12.     Officer John Wright prepared and swore under oath the search warrant application and participated in the planning and execution of the home raid.

13.     John Doe Officers 1–20 are the MPD officers that participated in the planning and execution of the home invasion.  Defendants Wright and the District of Columbia are in

---

[1] The allegations in this Complaint are based on personal knowledge as to matters in which the plaintiffs have had personal involvement and information and belief as to all other matters.

possession of the full names and badge numbers of Defendant John Doe officers, and their full identities can easily be discovered.  All of the defendant officers are sued in their individual capacities.

14.    The District of Columbia is the municipal entity responsible for operating the Metropolitan Police Department and for training and supervising the Defendant officers.

## Factual Background

## The Clear Lack of Probable Cause

15.    The warrant application made and relied on by the defendants was lacking in any information meeting standards of probable cause that have long pervaded this country's legal system.  *See generally* Exhibit 1.  No reasonable officer could have believed that it established probable cause to search the family's home.

16.    According to the warrant application, *see* Exhibit 1, MPD officers executed a vehicle search warrant on Russell Battle's Chevrolet Impala from Providence Street NW on February 9, 2013, "pending investigation."  The warrant application seeking permission to search Plaintiffs' home fails to mention the following facts: upon being stopped for his presence in a no-parking zone, Mr. Battle informed officers that they did not have consent to search his car and locked its doors.  MPD officers threatened to break into Mr. Battle's car if he did not comply. The officers blocked the car off with police tape and called a drug dog to the scene.[2]  At this point, the officers had no reason to believe that Mr. Battle had done anything illegal and had no reason to pursue a search of the car.[3]  Mr. Battle's car and person had been effectively seized —

---

[2] Conflicting eyewitness testimony contradicts the officers' assertions in the warrant application that the drug dog "alerted" officers to the presence of narcotics.

[3] African-American residents constitute nearly 80% of all traffic arrests in the District of Columbia despite being less than half the population of the city.  The actual racial disparities are far worse because the MPD includes in its "traffic" arrest statistics the arrest of protestors and demonstrators, who are overwhelmingly white.  African-American residents make up more than 90% of all drug arrests in the District of Columbia despite using drugs at the same rate as Caucasian residents.

without reasonable suspicion — as he was not free to leave, not free to access his car, and not free to comply with the law and move his car from the no parking zone.

17.     The vehicle was impounded by the MPD officers, towed from the premises, and searched two days later on February 11, 2013.

18.     The resulting search, as reported in the warrant application, revealed a zip-lock bag containing a white substance, a digital scale and razor blade, 23 clear zip bags containing a white rock substance, several empty zip-lock bags, and a handgun.

19.     The warrant application stated Mr. Battle advised officers of his home address as 1928 Capitol Avenue NE, Washington, D.C. 20002 ("1982 Capitol Avenue") and that Mr. Battle's Chevrolet was registered to that address. The warrant application further asserts that, on the day Mr. Battle's car was seized, he was observed going between 1928 Capitol Avenue and a truck parked behind the home.  The application does not indicate that Mr. Battle was carrying any objects or engaging in behavior outside of typical daily activity, much less any criminal activity.

20.     The warrant application contained no evidence of any illegal activity ever occurring at 1928 Capitol Avenue.

21.     The warrant application contained absolutely no connection to the home at 1928 Capitol Avenue other than that a police officer had found contraband during a traffic stop in the possession of someone who the officer believed to live there.

22.     The warrant application contained no other evidence of Mr. Battle being a drug dealer, being involved in a significant drug distribution enterprise, being involved in a weapons trafficking enterprise or even having a criminal record.

23.     Mr. Battle was not a full time resident at the 1928 Capitol Avenue residence.  He

split his time between work, the McCray home, and the home of his sick mother, where he spent the majority of his time.   The permanent residents of 1928 Capitol Avenue were not fully apprised of Mr. Battle's whereabouts at any given time and were unaware that he possessed drugs or a handgun.

24.     Not a single particularized fact connected any 1928 Capitol Avenue resident to any illegal activity.

25.     In the absence of a single particularized fact supporting probable cause to believe that evidence of criminal activity would be found at the home, the application instead relied on an officer's statements of "training" and "experience."   These statements were woefully insufficient to establish probable cause and were knowingly and recklessly false and misleading.

26.     Defendant Wright asserted that, because of his "training, experience and participation in narcotic and drug related investigations," he knew that persons who deal in controlled substances store a "stash" of their narcotics in their residence.   *See* Exhibit 1 at 3. Defendant Wright's application also claimed that these persons maintain "books, records, receipts, notes, ledgers, bank records," and other papers relating to the "importation," "manufacture," "ordering," and "distribution" of illegal substances in places where they will "have ready access to them, such as in secured places within their residences."   *Id.*

27.     Further based on his "training, experience and participation in narcotic and drug related investigations," Defendant Wright claimed that persons involved in illegal activity maintain documentation relating to the "ordering, sales and servicing" of firearms.   *Id.* Defendant Wright went on to explain that ammunition is typically sold in boxes known as "bricks" containing 50 rounds of ammunition, and that since "many guns, including larger assault weapon models, do not carry 50 rounds of ammunition," it is "very common" to find

extra ammunition in residences. *Id.* at 3–4. Defendant Wright's warrant application makes no attempt to explain why the presence of a handgun in an individual's car gives cause to believe that an individual engages in illegal firearms trafficking.

28. Defendant Wright's warrant application then sought permission to execute what amounted to an unlimited, unrestricted, colonial-era General Warrant to search the home at 1928 Capitol Avenue for "any other evidence of a crime that may be found." *Id.* at 4. This generalization is facially unreasonable. Any reasonable officer would know that police are not permitted to search a home for "any other evidence of a crime that may be found." Furthermore, the warrant that issued purportedly granted permission to search for a variety of things not even listed or explained in the affidavit, including "computers" and "phone records."

29. Defendant Wright's assertions of "experience" and "knowledge" were plainly insufficient, self-defeating, false, and recklessly misleading.

30. The application asked for a warrant to search the home at 1928 Capitol Avenue because Defendant Wright claimed to know that "individuals who deal in illegal controlled substances" keep items at their residences. Defendant Wright knew these assertions to be untrue and misleading. Indeed, in the same warrant application, Defendant Wright claimed that based on his "training" and experience," contraband and records are kept where dealers "have ready access to them" and offered dealers' residences simply as an example of *one* such location. *See id.* at 3. Officer Wright failed to offer evidence as to why the likelihood of drugs or records being kept in a personal residence is any higher than the likelihood of drugs being kept in any other conceivable location to which a narcotics dealer would have "ready access to," such as residences of friends, family members, and associates, or in places specifically affiliated with the operation of drug distribution activity such as a stash house or safe house. Specifically,

Defendant Wright failed to give a single particularized fact as to why it would be more likely to find evidence of a crime at 1928 Capitol Avenue as opposed to any other location Mr. Battle could conceivably have "ready access to."

31.     In many dozens of other warrant applications sworn by MPD officers to different Superior Court judges in the two-year period surrounding the warrant application in this case, MPD officers claimed under oath, based on the same "training" and "experience," that a broad category of people referred to as "drug traffickers"[4] attempt to hide the evidence of their criminal activities in other places that are *not* their own home.   Defendant Wright did not inform the issuing judge that, based on the MPD training and experience of the dozens of other officers seeking similar warrants, officers believed that there were numerous different places where a drug dealer might possess those same items.   The "training" and "experience" asserted by other MPD officers in different sworn warrant applications was exactly the opposite: that drug traffickers routinely store these same items in stash houses, the homes of friends, the homes of business associates, the homes of relatives, or other locations.

33.     Defendant Wright claimed to know through "training" and "experience" that "persons involved in illegal activities"[5] maintain ammunition and records related to the

---

[4] This deliberately broad term has little coherence as a general category of people with consistent habits.  Indeed, MPD officers are trained and routinely testify about the very different habits of different types of drug dealers.  For example, a small-time neighborhood dealer on a D.C. corner is far less likely to keep sophisticated computerized records of transactions or detailed financial banking records than a high-level multi-state or international manager of a drug-distribution enterprise.  By deliberately obfuscating the many distinctions between different types and levels of drug sellers, Defendant Wright falsely portrayed low-level dealers, who are exceedingly unlikely to keep any of the materials allegedly sought in their family's home, as having the same habits as would a cartel kingpin.

The results are violent home raids in which MPD officers claim, as in this case, the authority to examine every piece of paper, every private bank record, and every file on any computer that they find, even though they had never received a specific warrant to search through those electronic devices that contain the entire living records of the home's residents and even though such records are extremely unlikely to be in the places being searched.

[5] This generalization is facially unreasonable. The category of "persons involved in illegal activities" that Defendant Wright offered as a category with consistent habits is generalized beyond any reasonable meaning. For example, a person involved in driving without valid insurance likely has different habits than a person involved in using illicit drugs, both of whom are not certain to be involved in a weapons trafficking enterprise and likely have very different habits from someone who is.

"ordering, sales and servicing" of firearms in places to which they have ready access. *Id.* at 3. He further justified his request to invade the McCray home based on his "experience" regarding "larger assault weapon[s]." *Id.* These vague statements not only fail to establish a connection between weapons trafficking and all persons "involved in illegal activities" of any apparent type, but also lack particularity with regard to Mr. Battle and the McCray home. Defendant Wright failed to offer a shred of evidence suggesting that Mr. Battle, who only owned one handgun as known to the Defendant, maintained records of weapons sales and fire-arms related accessories, or why it would be more likely to find such items at 1928 Capitol Avenue as opposed to any other location Mr. Battle could conceivably "have ready access to." Defendant Wright further made reckless accusations regarding large assault weapons without providing a single particularized fact supporting the existence of such weapons in Mr. Battle's possession, much less in the 1928 Capitol Avenue home. Such broad, illogical conclusions and vague assertions about the purported habits of all "persons involved in illegal activities" are misleading and woefully insufficient to establish probable cause by any stretch of the imagination.

32.     Defendant Wright also knowingly failed to inform the issuing judge that it is the training and experience of MPD officers that actual drug and firearms dealers routinely store evidence of their crimes at places that are *not* their residences so as to hide them from police and rivals.  Many MPD officers routinely testify and swear under oath that, for these reasons, drug dealers store evidence at places other than their homes and provide "clean" addresses to police.

33.     Defendant Wright also knowingly failed to report to the issuing judge that many D.C. residents, particularly low-income residents, do not have a stable residence and live between multiple homes.

32.     Statements of "training" and "experience" thus purportedly give agents of the

District's government the ability to raid and search multiple homes and other locations for every traffic stop or street arrest in which they find contraband.

33.     The practical and logical result of these assertions is that, if a person is stopped on the street anywhere in the District carrying a handgun or an amount of drugs that MPD officers assert to be consistent with a drug sale, the MPD has trained its officers to claim the right to invade the entire home of any person who is related to that person, any person who is friends with that person, or any person who associates with that person, not to mention various other locations, such as vehicles and other storage areas commonly used to "stash" materials.  In a similar recent case in this Court, the MPD has taken the position that it is then permissible to strip search and probe the genitals of any person that is then found in that home, regardless of whether that person has ever had anything to do with any criminal activity.

34.     The MPD's training scheme and policies mean that any District resident, by virtue of having a drug "criminal" or gun owner in her family or among her acquaintances, has unknowingly subjected all of her life's possessions to a violent raid by government agents.  The act of government agents rifling through every single one of a life's accumulated possessions — medical records, books, food from the refrigerator, family photographs, bathroom supplies, bed sheets, mattresses, couches, pieces of artwork, computers, phones, and every item that helps to form a person's identity is a significant and traumatic experience that should only be allowed for good, particularized reasons.

35.     The experience of Tamika McCray, her uncle, and her six-year-old son illustrates this phenomenon. Defendant Wright's assertions in the warrant application show he had no probable cause to believe that evidence of a drug enterprise would be present in the McCray home rather than any of the numerous places that Mr. Battle could conceivably have "ready

access to."  According to Defendant Wright and other MPD officers themselves, drug criminals are known to hide contraband in *any one* of a virtually limitless set of possible locations. Furthermore, Defendant Wright made no attempt to establish probable cause in support of his outrageous leap of unfounded logic connecting persons who carry handguns to persons who engage in sophisticated weapons trafficking operations. Neither he nor any reasonable officer could have believed probable cause existed for finding sales records and ammunition relating to such an operation in the possession of Mr. Battle, much less the McCray home.

36.     Thus, the bare bones warrant application in this case removed any notion that there was probable cause to believe that the specific items sought would be at 1928 Capitol Avenue in particular.  Because no reasonable theory was offered connecting handgun owners to assault weapons dealers (or connecting gun trafficking to the 1928 Capitol Avenue home), and because the Defendants knew—but deliberately hid from the issuing judge--that there were numerous alternative places in which their "training" and "experience" taught that the evidence they sought was likely to be found, their own assertions completely undermine any probable cause to believe that the McCray home would contain any evidence of a crime.

**The Warrant Relied on False and Misleading Statements and Omissions**

37.     In addition to failing to establish any particularized probable cause justification to raid the McCray home, Defendant's generic and conclusory statements of "training" and "experience" were false and misleading.  Defendant Wright omitted to tell the Superior Court judge that when MPD officers execute such warrants after a traffic or street stop based only on their "training" and "experience" rather than actual evidence connecting the home to criminal activity, the warrant returns submitted by officers themselves prove that MPD officers *do not* find the items that they seek in the vast majority of cases.

11

38.     For example, examining all of the "training" and "experience"-based warrants in the one-year period surrounding the raid in this case in which MPD officers sought to search a home based solely on assertions that a drug criminal would keep drugs at home, police officers failed to find any drugs, let alone the drugs they were looking for, in almost 66% of the cases.

39.     The statistics are even worse considering that the large majority of home drug raids found not what MPD officers claimed that they would find, but turned up only small, personal amounts of marijuana.  If small amounts of marijuana are excluded, MPD officers failed to find illegal drugs that they were purportedly searching for in nearly 87% of the cases.

40.     According to the Department of Health and Human Services, the rate of illegal drug usage within the previous month by D.C. residents aged 12 and older is 13.6%, including 11.2% for marijuana use alone.[6]

41.     Considering the significant usage rate of illicit drugs in all areas and across all demographics of the District, the MPD's success rate in "training" and "experience"-based home raids (i.e., raids seeking to search a home without any particularized facts linking the home to criminal activity) is closer to what one would expect to find in random searches of homes occupied by D.C. families.

42.     The statements of "training" and "experience" to the Superior Court judge thus knowingly and recklessly omitted from the judge the poor success rate of such warrants.  It is the duty of the police officer swearing the warrant to inform the judge that the claims being made are not true and not substantiated by information collected by the MPD officers themselves.

43.     Statements under oath to a judge about what drug dealers "usually" or "commonly" or "habitually" do are especially misleading when MPD officers possess

---

[6] http://www.samhsa.gov/data/NSDUH/2k11State/NSDUHsae2011/ExcelTabs/NSDUHsaeTables2011.pdf   (Table1 and Table 3).  The usage rates are significantly higher for those 18 and older.

information that contradicts those vague statements of "experience."  By depriving the issuing judge of an accurate picture, Defendant Wright denied the neutral arbiter the ability to make a properly informed probable cause determination.

44.     In this case, Defendant Wright ultimately swore to the issuing judge that additional drugs, weapons, ammunition and records of drug and firearms sales would likely be found at 1928 Capitol Avenue home but omitted to tell the judge that, based on his and the MPD's actual experience in such "training" and "experience"-based raids in the District, it was far more likely that *no such evidence* would be found.   These are critical facts that any reasonable judge would need to know before authorizing what is among the most intrusive, traumatizing, humiliating, and dangerous actions undertaken by any government.

45.     Defendant Wright also sought to broaden the search of 1928 Capitol Avenue beyond illegal drugs to examine all of the papers, notes, and records that might be found in the family's home.   To do so, he asserted that his "training" and "experience" meant he knew individuals like Mr. Battle maintained a laundry list of papers and records, including "notes, ledgers, bank records, money orders, and other papers" and a wide variety of documents reflecting the "importation" and "ordering" and "manufacturing" and "transportation" of illegal drugs.   *See generally id.* at 3.

46.     In his attempt to expand the search authorization to every corner and file cabinet of the McCray home, Defendant Wright made an almost impossible logical leap to connect persons "involved in illegal activities" to "books, records, documentation and other papers" related to the "ordering, sales, and servicing" of assault firearms and ammunition. *Id.* Defendant Wright made no attempt to explain why a person who engages in general "illegal activities" would also be a sophisticated assault weapons dealer, let alone that such a person would have the

particular documents that he sought.  He further made no attempt to explain why a citizen carrying a firearm pursuant to his Second Amendment right is likely to run a black market weapon distribution scheme out of their home.

47.     Defendant Wright knew that it is extremely rare (if ever) that such "training and experience"-based home raids in the District of Columbia yield any such documents or records of drug distribution or firearms trafficking.  In the one-year period surrounding and including the raid of the Plaintiffs' home, MPD officers failed to locate such documents or other records related to a drug distribution enterprise in over 99% of such street-stop "training and experience"-based raids.

48.     During the same period, records produced by MPD officers show that 91% of such warrants searching for guns in the District failed to find any guns in the home.

49.     The MPD is even less successful in finding the documentary evidence of gun crimes that the Defendants purportedly sought (including "books, records, documentation and other records" related to the "ordering, sales and servicing" of illegal firearms, *id.*). According to MPD records, in the one-year period surrounding the raid of the McCray family home, MPD officers failed to find any such documentation in at least 94% of such cases.

48.     Defendant Wright, in an attempt to expand the search authorization from drugs to any and all private documents, papers, and bank records in the house, omitted to inform the issuing judge of the abysmal success rate of MPD officers locating such documentation in "training and experience"-based home raids.

49.     This record of failure is not surprising given how Defendant Wright misled the judge.  The warrant application left the issuing judge with the false impression that all "persons involved in illegal activities" share the same habits as sophisticated weapons dealers and that all

"drug traffickers" share the same relevant habits. *See supra* n. 6.   For example, the warrant application painted a picture of Mr. Battle — based on finding an unspecified amount of white powder substance and some empty sandwich bags found during a traffic stop — as one of those "drug traffickers" who must keep sophisticated banking records, money orders, ledgers, and other evidence of a drug importation or distribution ring in his residence.

50.     The Defendants knew, however, based on their training and experience, that many of those engaged in street-level drug selling in the District — those who are the vast majority of "drug traffickers" that MPD officers arrest — possess "habits" that are nothing like the sophisticated operations described in the warrant application.

51.     Defendant Wright knew, but did not report, that street-level drug sellers, to the extent that officers even had evidence that Mr. Battle was one of them, are utterly unlikely to possess the various specific items sought in the search warrant in their homes or even in the homes of friends or relatives or associates.

52.     The Defendants also knew that big-time drug traffickers who operate distribution rings have very different habits from those who sell small amounts of cocaine on the street.  The Defendants knew that drug-trafficking leaders and managers rarely trust lower level dealers with financial records, customer logs, distribution chain information, money, or even drug stashes.

53.     None of this knowledge was presented to the judge in this case, who was instead left with the impression that any person carrying white powder substance in a car that also had empty sandwich bags would be keeping "ledgers" and "receipts" and "financial records" in an easily accessible place such as his home.

54.     More specifically, the sworn affidavit makes no attempt to distinguish between the "habits" of indigent low-level street dealers and those of successful drug kingpins and

traffickers.   That wealthy kingpins might keep sophisticated paper or electronic records and suitcases of cash says nothing about whether indigent street-level dealers, who constitute the vast majority of MPD arrests and prosecutions, do the same.   To the contrary, experienced MPD officers like Defendant Wright know that different classes of dealers have dramatically different business models and practices.   In truth, the sophisticated items that Defendant Wright's "experience" dictated should be present in the home of an individual who "deal[s] in illegal controlled substances" are almost never found in MPD searches, and other items (like more drugs) are far more likely *not* to be found in a search like the one at hand.   Defendant Wright twisted his "training" and "experience" regarding the habits of sophisticated drug kingpins to mislead the judge to believe that his assertions applied to the vast majority of citizens D.C. police are actually seeking search warrants for — low-level indigent street dealers.   By combining these groups in his sworn affidavit, Defendant Wright misled the issuing judge about the person *actually involved in the investigation before the judge at that moment*.[7]

55.   Defendant Wright also misled the judge by asserting that, because bullets are not sold individually, id. at 5 ("[I]t is extremely uncommon for individual rounds of ammunition to be sold."), and only sold in "bricks" of 50, there would be additional bullets inside the home of Ms. McCray. Citing the same MPD "training" and "experience," however, a different MPD officer claimed under oath, to a different Superior Court judge seeking a different warrant, that, because one cannot legally purchase bullets in the District, "there are often places where you can buy loose bullets or individual bullets from other gun possessors."

56.   Defendant Wright made reckless and knowingly misleading statements in his

---

[7] Defendant Wright also failed to inform the judge that people stopped by the MPD often stay at multiple residences and are otherwise transient.   Other police officers have, when it serves their interests, sworn to this fact in other warrant applications to different judges.   Moreover, it is also "common experience" that many people, especially low-income people without stable finances or those with many family members in different locations, will "stay" at multiple residences. *See, e.g.*, 2013-CRW-1369 ("It is not uncommon for individuals to live between places.").

attempt to raid the McCray home and gain access to the most intimate parts of the family's life. Defendant Wright made no attempt in his affidavit to distinguish between the habits of various "drug traffickers" or the material differences between "persons involved in illegal activities" and those who engage in weapons trafficking. He gave not a single particularized fact establishing probable cause to find evidence of a sophisticated drug distribution ring, "large assault weapons" or related contraband in the possession of Russell Battle or in the home of his family. The warrant application's vague, general, and conclusory statements of "training" and "experience" were not only woefully insufficient to establish probable cause to search the McCray family home, they were also knowingly false, incomplete and misleading.

### The Violent Raid of the Family's Home

55.     Shortly after 8pm on February 21, 2013, at least 15 armed MPD officers raided the family home at 1928 Capitol Avenue NE.

56.     When the Defendants arrived, Tamika McCray was resting upstairs in her room unclothed.  Her six-year-old son A.B. was sitting at the kitchen table, settling down for dinner. Her 54-year-old uncle, James Tucker, was on the couch in the living room trying to recover from the flu.

57.     The Defendants banged loudly on the front door and identified themselves. Tucker responded that he needed to put the dog away in its crate and the officers in the front of the home affirmatively responded that they would wait.  Before Tucker had time to get off his feet and restrain the dog, a different set of MPD officers broke down the back door and burst into the home through the kitchen, where six-year-old A.B. sat by himself.

58.     Defendant MPD officers entered the home with guns drawn at Tucker, screaming and yelling epithets as they forcibly handcuffed him without explanation.  At no point did Tucker

resist or do anything aggressive or threating to the officers.  The Defendants continued to keep him in handcuffs and continued to hold loaded guns to his head even though it was clear he posed no legitimate threat.  Defendant officers would not even allow Tucker, who was sick and weak from the flu, to access a tissue for the snot running down his face while he was handcuffed and held captive in the living room. Because his hands were bound, he was helpless to wipe himself and he was forced to sit in humiliation as mucus ran down his face in front of armed strangers in his own home.

59.     Plaintiff McCray rushed downstairs to witness a large MPD officer placing fingers inside the underwear of her six-year-old son.  A.B.'s underwear was tight and white — it was readily apparent that no weapons or drugs could possibly have been concealed there. There was no indication whatsoever that the child posed a threat or that his underwear could conceivably be the hiding place for any of the drugs, ammunition, papers, ledgers, or other contraband and records that officers purportedly sought. Defendant MPD officers had no reason to believe that the 6-year-old child was involved in a drug or gun-trafficking enterprise.

60.     MPD officers held the family in the living room as they ransacked the entire home.  The officers made taunting jokes about toy guns and other "weapons" found in A.B.'s room.

61.     Due to the traumatic chaos unfolding in her home and the physical violation of her young son, Plaintiff McCray began to feel shortness of breath, numb hands, and chest pains. Knowing she had high blood pressure, McCray feared she was suffering a heart attack.  After MPD officers brazenly ignored several requests for medical attention, McCray was taken to the hospital via ambulance where she learned she had suffered a severe panic attack.

62.     The entire family was peaceful and non-threatening to officers from the moment

the back door was broken down and the home was overrun with armed officers.

63.     The defendants violently tore apart the house, far beyond what would have been necessary to search for drugs, weapons, ammunition, or records.  It took the family days of laboring to clean up their belongings.

64.     The home invasion was traumatizing and humiliating for the family.  To this day, Plaintiffs experience emotional difficulty and anxiety when recalling the event.

65.     The family had no knowledge that Mr. Battle had narcotics or a handgun in his car 10 days prior to having their home invaded.

### "Training" and "Experience"-Based Raids in the District of Columbia

66.     Over the past several years, the Metropolitan Police Department has adopted an aggressive addition to its traditional search warrant practices.  The MPD has expanded the number of armed home raids by establishing a pattern, custom, and practice of seeking search warrants for a person or family's home without *any* specific connection between that home and any illegal activity.  According to this approach, MPD officers are trained to search homes based solely on street stops resulting from the seizure of certain types of contraband.

67.     If officers lack any facts traditionally used to establish a connection to a home (such as a controlled buy, a confidential informant, witness statements, interrogations, police observations and surveillance, or physical evidence), the MPD has trained its officers to make vague, entirely unsubstantiated, and knowingly reckless and false statements of "training" and "experience" about the habits of "criminals."

68.     In such non-evidence, "experience"-based home raids, officers will typically search a person incident to an arrest.  If the person has contraband, officers will ask the person where he or she lives or examine their drivers' license.  Days or weeks later, a team of heavily-

armed officers will raid the residence (or sometimes multiple residences) based on assertions that the criminal must have further evidence of his or her crimes at the residence.

69.     In such cases, the MPD thus effectively turns searches incident to arrest into searches of entire homes incident to arrest.

70.     In the one-year period surrounding the execution of the warrant in this case, MPD officers (including dozens of officers and supervisors from police districts throughout the City) employed materially similar statements based on the MPD's "training" and "experience" concerning people who possess drugs in order to obtain and execute at least 81 home search warrants resulting from incidents in which police claimed to find drugs during a street stop, but presented no other evidence linking the home to any criminal activity.

71.     MPD officers are trained by the MPD to substitute these and materially similar statements of "training" and "experience" for particularized facts when they want to search a particular location but lack any actual facts connecting the location to any criminal activity.[8]

72.     An examination of hundreds of MPD warrant applications from the one-year period surrounding the application to search 1928 Capitol Avenue reveals not only material inconsistencies and numerous facially invalid warrants, but also a systemic lack of evidentiary rigor.  Much of the enterprise is based on interconnected falsities and reckless omissions — calculated and used by MPD officers to gain entry into the most intimate areas of people's lives when the particularized evidence does not support such extreme intrusions.

73.     Examining MPD warrant applications and inventory returns in bulk reveals a

---

[8] This systemic pattern extends beyond drug cases.  For example, in dozens of warrant applications, MPD officers assert that they will find additional firearms or firearms-related accessories at a home based solely on a street arrest of a person possessing a gun, even though MPD officers know that they are overwhelmingly unlikely to find that evidence in those home raids.  These warrant applications often contain assertions about particular items that are flatly contradicted by other warrants purportedly based on the same "training" and "experience."

In total, during the one-year period surrounding and including the raid in this case, MPD officers executed similar home search warrants based solely on statements of "training" and "experience" after finding contraband during a street arrest in 130 cases.

police department that not only tolerates this systemic behavior but that has affirmatively trained its officers to make specific sworn assertions of expertise like the ones made by Defendant Wright, even though the MPD and its officers know the assertions being made are false, unsubstantiated by the evidence that the MPD itself collects, self-defeating, or grossly misleading to the issuing judge.

74.     Even though MPD officials and officers know that violent home raids in which government agents rifle through an entire lifetime's worth of a family's most intimate possessions are among the most intrusive, frightening, demeaning, and traumatizing experiences to which a government can subject its citizens, the MPD has failed to establish proper training and supervision policies to ensure that its officers engage in such raids for valid reasons.

75.     The MPD has employed increasingly violent, unnecessary, and devastating force in executing those warrants — even warrants in which there is no threat of violence and even when it is apparent that there is no risk of harm to officers.  Added to the enormous intrusion on privacy inherent in home searches is now the violent force of special militarized MPD units, armed with laser-sighted weapons, machine guns, flash grenades, and shields.

76.     Approximately 91% of all drug arrests in the District of Columbia are of African-Americans, even though African-American residents and Caucasian residents use illegal drugs at the same rates.   On information and belief, the racial demographics of "training" and "experience"-based home raids are even more disproportionately African-American.

77.     Counsel for Plaintiffs has conducted an extensive random sample investigation of "training" and "experience" based warrants throughout D.C., including many dozens of interviews.  Counsel has yet to locate a single example of such a home invasion that did not involve a family of color.

## Claims for Relief

**One:  The Warrant Application Was So Lacking in Probable Cause that No Reasonable Officer Could Have Relied on It in Good Faith.  Reliance on the Warrant Application Violated the Fourth Amendment.**

77.     Plaintiffs incorporate by reference the allegations in paragraphs 1–76 above.

78.     Defendants obtaining, planning, and executing the search warrant for the Plaintiffs' home relied on a warrant application that was so facially lacking in probable cause that no reasonable officer could have relied on it in good faith to search the family's home.  The warrant application utterly failed to provide any evidence linking the home to any criminal activity, let alone to establish probable cause that the specific items sought would be found there.  The application's wild assertion of a sophisticated gun trafficking operation was woefully lacking both a logical basis and any shred of particularized evidence linking the 1928 Capitol Avenue home to any such activity.  The warrant application's self-defeating statements of "training" and "experience," which identified numerous possible locations other than 1928 Capitol Avenue (such as any location to which Mr. Battle would have "ready access") demonstrated that the Defendants had no reliable idea whether any evidence would be found at 1928 Capitol Avenue in particular.

**Two:    The Warrant Application Contained Statements that Were Knowingly and Recklessly False and Made Material Omissions.**

79.     Plaintiffs incorporate by reference the allegations in paragraphs 1–78 above.

80.     The warrant application presented to the Superior Court judge contained numerous statements of "training" and "experience," as well as statements concerning the stop and arrest of Russell Battle, that were knowingly and recklessly false and misleading.  The warrant also omitted material facts known to Defendant Wright that, if presented, would have undermined the asserted basis for seeking the warrant, including the fact that the vast majority of

"knowledge" and "experience"-based searches fail to uncover records, ledgers, bank statements, electronic files, or even the drugs and weapons sought by the MPD.  The Fourth Amendment prohibits obtaining a warrant on the basis of knowingly and recklessly false and misleading assertions as well as the knowing and reckless omission of material information that would undermine a probable cause finding.

**Three:  The Warrant Was Clearly Overbroad Such that No Reasonable Officer Could Have Executed the Warrant In Good Faith.**

81.     Plaintiffs incorporate by reference the allegations in paragraphs 1–80 above.

82.     The Fourth Amendment requires that search warrants and applications state with particularity the things sought to be recovered and the probable cause to justify a belief that those particular items will be present in the place to be searched.  The warrant executed by Defendants purportedly sought numerous items, including items never described in the warrant application and items for which no justification was presented in the warrant application.  For example, nothing in the warrant application authorized or justified the seizure and search of cash, safes, computers, telephone bills or of a variety of other documents that permitted officers raiding the home to search through all of the most intimate paper and electronic details of the family's life.

**Four:  The Warrant Application Contained Information Obtained in an Unconstitutional Manner.**

83.     Plaintiffs incorporate by reference the allegations in paragraphs 1–82 above.

84.     The warrant application relied on material information derived from the unlawful stop and unconstitutional search of Russell Battle and his vehicle.  That information was improperly included in the warrant application in violation of the Fourth Amendment.

**Five: The Obvious Lack of Probable Cause and False and Reckless Statements and Omissions Were the Result of a Policy, Pattern, and Custom of Such Conduct by the MPD and the Result of the MPD's Failure to Properly Train and Supervise Its Officers.**

85.     Plaintiffs incorporate by reference the allegations in paragraphs 1–84 above.

86.     The MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of "training" and "experience" that are unsubstantiated, vague, self-defeating, recklessly misleading, and woefully insufficient to substitute for actual evidence.   The MPD has established a pattern, policy, and practice of providing boilerplate language that contains insufficient, false, and reckless statements of "training" and "experience," and training its officers to use and rely on such statements concerning the habits of minor drug offenders and other offenders stopped on the street as a purported substitute for any actual evidence or police investigation into any evidentiary link to a particular residence.   According to the warrant returns and warrant applications prepared, collected, and retained by the MPD, this pattern, policy, and practice is implemented by officers pursuant to their training in many dozens of cases each year, in which MPD officers have not obtained a single piece of actual evidence linking a residence to any illegal activity.   The MPD has failed to train or properly supervise its officers on the Fourth Amendment standards for performing highly intrusive home raids.

**Six:   Officers Raiding the Home Used Excessive Force and Made Unnecessary and Unreasonable Seizures in Violation of the Fourth Amendment.**

87.     The Plaintiffs incorporate by reference the allegations in paragraphs 1–86 above.

88.     The MPD officers raiding the home unlawfully searched the home and its occupants and used unnecessary and excessive force.   The Defendants pointed and continued to hold guns to the head of Plaintiff James Tucker even though he was calm and never threatening. They then performed a search inside the tight white underwear of a six-year-old child whom no reasonable officer could have believed to be a legitimate threat.   The invasion was so violent that it caused Plaintiff McCray to have a panic attack and be rushed to the hospital.

### Request for Relief

WHEREFORE, Plaintiffs request that this Court issue a judgment against the Defendants:

a.      Holding the appropriate Defendants liable to the Plaintiffs for compensatory damages in an amount appropriate to the proof adduced at trial;

b.      Holding the appropriate Defendants (other than the District of Columbia) liable to the plaintiffs for punitive damages in an amount appropriate to the proof adduced at trial;

c.      Awarding to Plaintiffs their costs and reasonable attorneys' fees; and

d.      Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. Bar No. 999294)
Phil Telfeyan (D.C. Bar Application Pending)
Equal Justice Under Law
916 G Street NW, #701
Washington, D.C. 20001
(202) 681-2409
*Attorneys for Plaintiffs*

Date: September 14, 2015